Filed 7/20/15  In re J.C. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.C., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>S. W. et al.,<br><br>    Defendants and Appellants. | A143169<br><br>(Contra Costa County<br>Super. Ct. No. J1300347) |

**INTRODUCTION**

Stephanie W. (Mother) and Jack C. (Father), the parents of minor J.C., appeal from the juvenile court's order denying father's petition for modification and terminating their parental rights.  (Welf. & Inst. Code, §§ 388, 366.26.)[1]  Both parents contend Father's modification petition alleged a prima facie case of changed circumstances, and therefore the juvenile court abused its discretion by summarily denying it.  Additionally, Mother contends the ICWA[2] notices were deficient, and Father argues the court erred by terminating his parental rights because the "continuing beneficial relationship exception" applies to him.  (§ 366.26, subd. (c)(1)(B)(i).)  We affirm the juvenile court's orders.

---

[1]  Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

[2]  Indian Child Welfare Act of 1978, title 25 United States Code section 1901 et. seq.

# PROCEDURAL AND FACTUAL BACKGROUND[3]

We set forth the facts in relation to Father as previously stated in our opinions in *In re G.C. supra*, A138876 and *J.C. v. Superior Court*, *supra*, A142051, from which we quote pertinent portions:

"G.C.[4] was born March 17, 2013.  G.C. is mother's first child.  G.C. was detained following a hearing on March 22, 2013.  Weekly supervised visitation of one hour with both parents was ordered.

"On March 26, 2013, a petition was filed under section 300, subdivision (b) alleging that 'there is a substantial risk that the child will suffer serious physical harm or illness because mother is unable to adequately supervise or protect the child due to the mother's untreated mental illness.'  The petition was amended to include the allegation of a substantial risk of harm to G.C. as a result of father's anger management and substance abuse problems.

"On April 16, 2013, father waived his right to a jurisdictional hearing and pleaded no contest to the allegation of the amended petition . . . .

"On March 19, medical social worker Dominguez went to mother's hospital room to ask father to meet privately with her.  He was disheveled, angry, loud, and smelled of alcohol.  He yelled at her, 'I'm tired of being woken up.  I'm having to meet with people every 15 minutes.'  When asked if he had been drinking, he yelled, 'I had a few drinks last night and it's none of your business.'  He added:  'I don't need to be woken up for this. . . .  I'm not talking to you.  You're going to write things down like a third grade teacher and then stuff a microscope up my ass.'  He stormed out of

---

[3]  On our own motion, we take judicial notice of our prior opinions in *In re G.C.* (Apr. 2, 2014, A138876 [nonpub. opn.]) and *J.C. v. Superior Court* (Aug. 4, 2014, A142051 [nonpub. opn.]).  (See Evid. Code, § 451, subd. (a).)

[4]  In the first opinion, J.C. was referred to as G.C.

2

the social worker's office; the social worker called security, but father left the hospital before security arrived. Hospital staff was informed not to allow him back in.

"When interviewed by [Contra Costa County Children and Family Services (Bureau)] social worker Julie Lutz, mother said father had a child from a previous relationship he could not raise because he had accidentally given his ex-wife a black eye while protecting himself, and he was arrested for that. She admitted she and father engaged in pushing, shoving and grabbing, but he never bruised her. He gets angry and rants and raves, and the police had been out to his home a few times, but no one had been arrested. She was a little concerned about father being around the baby because he gets angry and yells a lot.

"Social worker's interview of mother on March 19 apparently ended when father returned to the room in a highly agitated state. Informed by the social worker of the upcoming detention hearing, he pointed at her face and said 'this is all your fault' in a threatening manner. He said he would be back with some friends. He yelled and stormed around the room until two sheriff's deputies arrived and escorted him out of the room.

"Father had a prior child welfare history from 2000 concerning the four-year-old son of a prior girlfriend. There were substantiated allegations of physical abuse to the child caused by father spanking the boy hard enough to leave bruises, and of general neglect by the mother for failing to protect the child from physical abuse by him. The child also witnessed incidents of domestic violence between his mother and father." (*In re G.C.*, *supra*, A138876, slip. opn. pp. 2–3.)

Following a contested dispositional hearing, both parents appealed from the court's jurisdiction and disposition orders adjudging G.C. a dependent child of the court and finding by clear and convincing evidence that return of the child to the parents' custody would be detrimental to her. We affirmed the court's orders, but

3

remanded for compliance with ICWA notice requirements. (*In re G.C.*, *supra*, A138876, slip opn. p. 18.)

"Father's April 2013 reunification plan required a 52-week anger management program, parenting education, individual counseling, outpatient substance abuse program, substance abuse testing, and attendance at [a] 12-step program one to two times per week. In August 2013, Father's attorney filed a motion to be relieved as counsel after Father made a movie regarding a complaint about this attorney to the State Bar in which he depicted pictures of a cat sharpening its claws while stating[,] ' "I'm going to do a little Bitch slapping." ' The court granted the motion.

"Father initially refused to engage in services, but then provided documents indicating he began anger management classes in September 2013. Father then posted two videos on social media sites in which 'he made threatening and aggressive statements against the Bureau, social workers and child's attorney,' stating 'he is a very angry man and if anyone comes between him and his child, he was going to go after them.' At a supervised visit with the minor on November 5, 2013, Father told a social worker[,] ' "I know people, you know . . . my father and grandfather are tough . . . military people . . . . I know people in the mob . . . you understand why I don't like anyone controlling me." '

"At the six-month status review hearing in January 2014, Father submitted evidence he had attended 34 NA/AA meetings between October 31, [2013] and January 6, 2014, completed 20 hours of anger management instruction, enrolled in, but had not started, two parenting classes, completed 20 hours of instruction in parent education seminars, and attended six individual counseling sessions and six anger management classes. The court found that return of the minor would create a substantial risk to her [well-being], and ordered that Father receive additional reunification services and have supervised visitation.

4

"The first unsupervised visitation between the minor and Father was scheduled for March 25, 2014. While a friend of Father's, Ben Laskari, was driving him to the visit, Father began repeatedly punching the driver with a closed fist. Two motorists called police to report the incident, and Father was arrested at the Bureau's office. Laskari denied being hit, and later went to one of Father's anger management classes and 'start[ed] telling them that nothing happened[, they] . . . didn't have any fight.' When asked about the incident at the 12-month review hearing in May 2014, Father refused to answer questions and stated he wanted to 'plead the Fifth.' Giving the same reason, Father also refused to answer questions about threatening his previous attorney. He did, however, acknowledge posting a message on Facebook stating he was going to bulldoze down the 'department of social services.'

"A social worker testified she performed [an] Internet research regarding Laskari, because he 'would always be present during the visit [with the minor] in the lobby, and he requested several times to attend the visits to visit the child.' On four occasions, Laskari 'became aggressive in his conversations' with the social worker. She discovered Laskari had posted 'hundreds and hundreds' of videos of soft-core pornography on the Internet, linked to his Facebook page which indicated he was a screenwriter. Laskari told the police officer who responded to the March 25 incident that he met Father at the county hospital, and thought he would 'be a good actor in one of [his] films.' The social worker had a discussion with Father about 'what is safe for the child and who should be around [her].' Father told her he was unaware of the films and agreed to investigate, but the relationship between Father and Laskari continued. The social worker learned Laskari had appeared at one of Father's anger management classes to deny that the punching incident occurred.

"At the conclusion of the 12-month review hearing, the court found there was a substantial risk of detriment if the minor was returned home to Father's custody. The court stated[,] 'The violent incident in the vehicle is a key factor in this case. Driving

5

down the street, hitting or striking a driver of a vehicle is not only a strong indicator that the violence tendencies are still up front with [Father], that he does not have safety plans or controls over his triggers. . . .  [¶]  I also find the risk to be real.  This record is replete with evidence from [Father's] side that he's gone to multiple classes. . . . There's an old saying, it's easy to talk the talk, but it's tough to walk the walk.  And I listened to [Father's] testimony, and he clearly knows the rules and the things you're supposed to follow, but they have not been internalized yet.  And his insight was very lacking.  If he had real safety plans, he would have used those instead of striking Mr. Laskari.  [¶]  So I do find that there is a substantial risk—a definite risk to the child if the child is returned home.  There's no way in my mind that it would be safe to return that child home.  [¶]  The evidence also shows that [Father] is reluctant to break off a relationship with Mr. Laskari that is either supportive of his domination over the man or perhaps involving other issues that would not be healthy for the child to be raised in [that] environment . . . .'

"The court terminated reunification services to Father and set a hearing under section 366.26." (*J.C. v. Superior Court*, *supra*, A142051, slip opn. pp.3–5.)

The court also reviewed the ICWA notices and took evidence from social worker Munisha Vohra on the steps she had taken to comply with ICWA's notice requirements.  Based on this evidence, the court found ICWA did not apply to J.C.

Father filed a petition for extraordinary writ challenging the court's orders terminating reunification services and setting a hearing under section 366.26, but not the trial court's ICWA finding.  Mother did not file a writ petition.  In an opinion filed August 4, 2014, this court denied Father's writ petition. (*J.C. v. Superior Court*, *supra*, A142051.)

The hearing on termination of parental rights was set for September 5, 2014. On that date, Father filed a section 388 request for modification of the court's orders

6

terminating reunification services and setting the permanency planning hearing. As a changed circumstance, the request stated Father "has continued to . . . improve on his anger management skills and, importantly, his ability to show insight into his actions. (Please see attached letter from Mike Carolla.) He has also maintained regular, consistent, and positive contact with the minor."

The letter from therapist Mike Carolla stated Father began psychotherapy with him in November 2013; since then Father had attended 10 individual sessions and "over 16" group anger management sessions. "He has been consistent in his attendance, open and willing to participate and examine his own behavior, and has shown ability to demonstrate insight into past behaviors." In his opinion, Father "has made significant improvement in his self management skills as well as his ability to manage himself with others." He had shown "remarkable improvement in managing the challenges of dealing with the mentally ill mother of his child" and also "demonstrated the insight necessary to take full responsibility for his behavior regardless of the behavior of others." Mr. Carolla saw Father's past struggles with anger management as largely due to a traumatic brain injury he suffered in a car accident.[5] Mr. Carolla had been "impressed" with Father's "most recent progress" and opined that Father was capable of safely parenting his young child at this time.

Finding the current letter by Mr. Carolla "remarkably similar" to what was presented at the previous hearing, the court found no new evidence or evidence of

---

[5] In a letter dated February 5, 2012, admitted into evidence at the May 22, 2014 review hearing, Dr. Philipp Bannwart of the Concord Health Center wrote: "I find it hard to believe that [Father] suffered of [*sic*] permanent brain injury due to a closed head trauma during the accident. Reason: His memory is overall too good and confusions are fluctuating in him, pointing more to an emotional cause or block than permanent organic brain damage."

7

changed circumstances and denied the modification request without a hearing.[6] The court stated, in part, there was "absolutely no new evidence. It's virtually the same statement made by Mr. Carolla that I did not find credible at the last hearing. I find no new evidence to change that opinion, no new bases for finding that credible."

The section 366.26 hearing was held September 10, 2014. A group exhibit of photos depicting Father and the minor at supervised visits was admitted into evidence. Social worker Chau Nguyen testified that since the minor's removal in March 2013, both parents have had regular and consistent visits with the minor. For the most part, these visits have gone well. As far as a bond between the minor and her parents, Nguyen opined that it was more of a recognition of familiar adults which the minor

---

[6] At the previous hearing, defendant presented a checklist-style progress report signed by Mr. Carolla and dated May 21, 2014. Mr. Carolla indicated that Father had demonstrated "satisfactory" progress in appearing to accept responsibility for his behavior; cooperating and participating in the program; and appearing to understand skills of conflict resolution. Father had attended 29 sessions to date. According to Carolla, Father "continues to show growth + improvement." There was no mention of the altercation with Mr. Laskari on March 23, although Mr. Carolla admitted Father told him he had hit Mr. Laskari in a May 5 telephone conversation with the social worker.

Also, in the April 9, 2014 status review report, the social worker summarized a March 20, 2014 report from Mr. Carolla in which he stated that after 17 anger management classes and 10 individual counseling sessions, "[Father] has been improving emotional management skills, taking responsibility for current and past behaviors and situations, and understanding the level of responsibility required to adequately provide for a young child emotionally, financially, as well as physically. Mr. Corolla [*sic*] stated that due to some symptomology from a previous head injury, he was previously somewhat unsure of a positive prognosis for [Father's] ability to adequately parent in the near future. He further stated that his major concern was [Father's] ability to manage his behavior when stressed or challenged. Mr. Corolla [*sic*] stated that over the past few months, [Father] has shown significant improvement in his ability to manage his behavior, as well as demonstrate significant improvement in his ability to show insight into his emotional and cognitive process. Mr. Corolla [*sic*] stated that [Father] is able to take responsibility for everything he needs to do to be ready to assume parenting duties. Mr. Corolla [*sic*] stated that in his opinion should [Father] continue to improve at the rate he has over the past few months, he would be able to demonstrate that he is capable of being an appropriate and healthy parent over the next six months."

8

displayed toward the social worker and her foster parents as well as her biological parents. Occasionally, the minor did not want to go to her father. Once, she arched her back and said "no" when the social worker was handing the minor to Father.

During the reunification period of approximately one year, visits between Father and the minor were supervised, one hour once a week. After services were terminated in March 2014, supervised visits were reduced to one hour, twice a month.

Ms. Nguyen concluded in her report that the minor would benefit from being adopted by her current caretakers, the prospective adoptive parents. They have been caring for the minor since she was two days old. They have done everything the Department asked them to do: brought the minor to visits, taken her to the doctor, and met all her daily needs.

Father testified at the hearing. Except for one visit, a birthday party which the minor's mother attended, all visits have gone well. At the last visit, the minor started to scream and cry when it was time for him to leave. She smiles at him, runs to him, kisses him, and calls him Dada since she started babbling. He recalled the visit at which the minor arched her back and said no when the social worker tried to hand her to him. Ms. Nguyen had her cell phone and iPad out, was moving about and verbally engaging her, which was distracting and entertaining to the minor.

At the conclusion of the hearing, the court found clear and convincing evidence the minor was adoptable and would be adopted by her foster-adopt parents. It also found beyond question the biological parents had maintained regular visitation with the child. However, the court did not find the evidence sufficient to prove that the "continuing relationship exception" to section 366.26 should apply. The court viewed the relationship between the minor and her mother and father as "not to the extent that it would benefit the child to the degree that terminating the parental rights would be detrimental. . . . With parental rights being terminated, the child would not suffer any detriment that would outweigh the benefit that the child would gain being

adopted into a permanent home. [¶] The child is roughly 18 months, a year old. She's spent virtually her whole life with her foster parents except for the visits which were . . . an incident benefit to the child." Accordingly, the court permanently terminated the parental rights of mother and father.

## DISCUSSION

### *Denial of Section 388 Petition for Modification.*

Both parents challenge the court's summary denial of Father's section 388 petition for modification of the prior orders terminating services and setting the section 366.26 hearing. Father contends the court should have held a hearing on the merits of his section 388 petition because the petition presented prima facie evidence of changed circumstances. On March 20, 2014, Mr. Carolla reported he believed Father would be able to safely parent the minor within six months; at the time of the petition, he believed Father was currently able to safely parent her.

Mother joins in this contention. She argues Mr. Carolla's letter demonstrated the availability of admissible evidence to support Father's claim that his anger management problems, which led to the minor's removal at birth, had been successfully resolved through therapy. She also argues Father's history of consistent visitation showed it would promote the minor's best interests to continue to build upon the established relationship with Father.

We review a juvenile court's summary denial of a section 388 petition for abuse of discretion. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) Reversal is warranted only when the juvenile court "has exceeded the bounds of reason by making an arbitrary, capricious or patently absurd determination." (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642.)

"To prevail on a section 388 petition, the moving party must establish that new evidence or changed circumstances exist so that the proposed change in the court's order would promote the best interests of the child." (*In re Marcelo B.*, *supra*, 209 Cal.App.4th

10

at pp. 641–642.) However, to trigger a hearing on the merits, the petitioner need only make a prima facie showing of both elements. A prima facie case is made on a showing of "probable cause." (*In re Aljamie D*. (2000) 84 Cal.App.4th 424, 432.) A probability of prevailing on the petition is not required to trigger a hearing. (*Ibid*.)

In our view, the juvenile court did not abuse its discretion when it determined that Mr. Carolla's latest letter did not credibly point to a change of circumstances. Mr. Carolla's current letter, like his "progress report" admitted at the prior hearing, failed to address the elephant in the room: Father's attack on Mr. Laskari in the car as Laskari drove Father to his first unsupervised visit with the minor. In light of Mr. Carolla's failure to acknowledge that incident in his letter, or address why it did not show Father continued to have anger management problems, the juvenile court remained understandably skeptical of Mr. Carolla's opinion that Father "has made significant improvement in his self management skills as well as his ability to manage himself with others" and was currently "capable of safely parenting his young child." The soundness of Mr. Carolla's opinions were undermined by his insistence, without explanation, that Father's past struggles with anger management are "largely due to a traumatic brain injury received in an auto accident." As noted, Father's treating physician had expressed disagreement with that premise in a report of which Mr. Carolla should have been aware. At a minimum, to support his opinion, one would have expected Mr. Carolla to explain why he disagreed with the treating physician.

At most, Mr. Carolla's letter demonstrated that Father continued to diligently work on his anger management problem. But Father had been working on his anger management problem since the disposition hearing. At the 12-month review hearing, Father had declined to discuss his altercation with Mr. Laskari in his testimony, and Mr. Carolla had similarly declined to discuss it in his progress report. Nothing had changed. It is not an abuse of discretion to deny a section 388 petition that "alleges

11

merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent . . . might be able to reunify at some future point." (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47.) Granting such a petition "does not promote stability for the child or the child's best interests." (*Ibid.*) "At the point of these proceedings—on the eve of the section 366.26 permanency planning hearing—the child[]'s interest in stability was the court's foremost concern and outweighed any interest in reunification. [Citation.]" (*In re Edward H.* (1996) 43 Cal.App.4th 584, 594.) No abuse of discretion appears.

***ICWA.***

Mother contends the ICWA notices sent to the Cherokee Tribes were insufficient because they did not specify the name of paternal ancestor Woodrow C., and contained misleading information about Father's representations concerning his potential Indian ancestry. Mother has no Indian ancestry. (*In re G.C.*, *supra*, A138876, slip opn., p. 9.) Father does not join in this argument.

"On March 19, 2013, an ICWA inquiry was made of mother, who stated she had no American Indian ancestry. An ICWA inquiry was not made of father because 'he was not cooperative.'

"On April 30, 2013, father signed an ICWA-020 form ('Parental Notification of Indian Status') averring that he is or may be a member of, or eligible for membership in, the Cherokee tribe because his grandmother, Sophie Alford, is or was a member of that tribe. The disposition report dated the same day noted that G.C. may be Cherokee and ICWA eligible, and that notices had been given in court to the parties and the attorneys on April 18, 2013. ICWA was not mentioned at the disposition hearing on May 30, and no notice to the tribe is included in the clerk's transcript." (*In re G.C.*, *supra*, A138876, slip opn., pp. 9–10.)

In the appeal from the juvenile court's disposition order, Mother joined Father in challenging the Bureau's lack of compliance with ICWA's notice requirements.

12

On April 2, 2014, this court affirmed the trial court's jurisdiction and disposition orders, but agreed the Bureau was noncompliant and remanded the matter to the trial court for compliance with ICWA. (*In re G.C.*, *supra*, A138876, slip opn., p. 18.)

On January 9, 2014, while parents' appeals from the disposition hearing were pending, Father completed a second ICWA-020 form for the Bureau. He listed Sophie Crowley or Crowly, Woodrow C., and Jack C., Sr., as possible members of the Cherokee tribe, but he provided little or no contact or identifying information. That same day, in court, Father provided a phone number for his mother in Florida. He also stated his deceased grandmother, Sophie Crowley, informed him of his Indian ancestry.

On January 15, Father's counsel represented to the court that the information Father provided at the last hearing was all that he had. On January 16, Father testified about the information he had provided on the second ICWA-020 form. He clarified that Sophie Crowley Alford was his grandmother on his father's side; she was born in 1921 in Bennettsville, North Carolina. Woodrow C. was his father's father; he was from Dillon (not Dill*i*on), South Carolina. Jack C., Sr., his father, was born October 8, 1942, and was also from Dillon, South Carolina, but he currently resided in Laurinburg, North Carolina. Father did not have an address for him, but he did have a phone number for him at home that he forgot to bring to court. Father was directed to provide the phone number to the Bureau. County counsel indicated notices would be sent based on this information.

At the 12-month review hearing, the court reviewed and admitted into evidence the Bureau's ICWA notices. Social worker Munisha Vohra testified about the steps she had taken to comply with ICWA's notice requirements. After the prior hearing, Father provided phone numbers for his father and some other relatives. She called these people and left messages, none of which were returned. She did speak with Father's mother, who informed her there was no maternal Native American ancestry,

13

and she was not aware of any on the paternal side of the family. After that, Ms. Vohra sent notices to the various Cherokee tribes utilizing the information she had. The Indian tribes responded the minor did not qualify as an Indian Child. Based on this evidence, the court found ICWA did not apply to J.C. No objection to the notices or the court's ruling were made by either party at the hearing.

The record on appeal contains the notices and documents sent, as well as the tribes' acknowledgments of receipt. Although "Woodrow [C.]" was not listed as Father's grandfather on the ICWA-040 or ICWA-030 forms sent to the tribes, Father's second ICWA-020 notice, listing Woodrow [C.] as an ancestor, was included in the packet of documents sent to the tribes. The tribes responded that based on the information provided to them, J.C. was not eligible to be considered an Indian child. Moreover, the letter of acknowledgement sent to the Bureau by the Cherokee Nation specifically listed Woodrow C. as one of the names provided to them that did not belong to an enrolled member of the tribe.

Father filed a petition for writ from the setting of the section 366.26 hearing, but did not raise lack of compliance with ICWA's notice requirements as an issue. Mother did not file a writ petition.

Although Mother does not have Indian ancestry, she has standing to raise ICWA compliance issues. (*In re B.R.* (2009) 176 Cal.App.4th 773, 779.) And, in general, ICWA notice issues may be raised for the first time on appeal even though they were not raised below. (*Ibid*; see *In re J.T.* (2007) 154 Cal.App.4th 986, 991; *In re Nikki R.* (2003) 106 Cal.App.4th 844, 849.) However, some Courts of Appeal have concluded that when a case is remanded to the juvenile court for the purpose of curing ICWA notice defects, the parent is represented by counsel at the post-remand compliance hearing, and counsel raises no objection to new ICWA notices, the parent has forfeited related ICWA notice issues in a second appeal. (*In re X.V.* (2005) 132 Cal.App.4th 794, 804–805 (*X.V.*); *In re Amber F.* (2007) 150 Cal.App.4th 1152,

14

1156; *In re N.M.* (2008) 161 Cal.App.4th 253, 268–270; *In re Z.W.* (2011) 194 Cal.App.4th 54, 64.)  Other Courts of Appeal disagree.  (*In re Alice M.* (2008) 161 Cal.App.4th 1189, 1197; *In re Samuel P.* (2002) 99 Cal.App.4th 1259, 1267.)  The question whether the rule of forfeiture forecloses a second appellate challenge to the adequacy of the ICWA notices given, on an appeal from the termination of parental rights, when no objection was made to the adequacy of the notices at the post-remand hearing to review compliance with ICWA notice requirements, is under review by our Supreme Court.  (*In re Isaiah W.* (2014) 228 Cal.App.4th 981, review granted Oct. 9, 2014, S221263.)

In our view, under the circumstances present here, Mother has forfeited her challenge to the ICWA notices.  At the 12-month review hearing, all counsel were given the opportunity to review the notices sent by the social worker and cross-examine her about what she had done to comply with ICWA, prior to the court's ruling.  A question or an objection about the omission of Woodrow C.'s name from the ICWA-030 form sent by the social worker, or her inclusion of information about Father's early representation of non-Indian ancestry, would have permitted the social worker to resend new notices correcting the errors alleged here, if necessary, or permitted a finding that new notices were not required, which would have been reviewable for error.  Yet no objection was made to the notices, or to the court's ruling, at the hearing.

Mother or Father also could have challenged the adequacy of the ICWA notices by writ after the court terminated reunification services, but they did not.

For the reasons stated in the *X.V.* opinion, we agree that deciding whether to apply the forfeiture doctrine in this situation requires us to balance the interests of Indian children and tribes under the ICWA against the interests of dependent children to permanency and stability.  (*X.V., supra*, 132 Cal.App.4th at p. 804.)  In this case, the minor has been in foster care since she was two days old.  After 12 months of

15

reunification services, Father was unable to reunify with her. The minor is fortunate in that she has lived in the same stable foster home the entire time, and the foster family is willing to adopt her. But those fortuitous circumstances should not blind us to the fact that her permanent plan remains in limbo, and circumstances can change for unexpected reasons. In this case, for the reasons articulated in *X.V.*, we think the minor's interest in permanency and stability is paramount (§ 366.26), and militates in favor of forfeiture.

In any event, Mother's claim is not meritorious. Woodrow C.'s name as a possible ancestor was brought to the attention of the tribes by way of Father's second ICWA-020 form, which was apparently included in the packet of information sent to the tribes. The record demonstrates the Cherokee Nation must have been in receipt of this information when it determined J.C. was not an Indian child, because it listed Woodrow C. as one of the possible ancestors it had investigated. Moreover, Mother does not explain how the tribes could have been misled by the inclusion of the information that in *2013* Father reported he did not have Indian heritage. Presumably, this information explained the long delay in sending ICWA notices to the tribes. The facts that ICWA notices identifying potential Indian ancestors *were* sent to the tribes, and that the tribes reported searching their records for tribal enrollment of the persons identified, belie Mother's claim the information "could have misled the Cherokee tribes during the decision making process." The notices were not perfect, but they were adequate to inform the Cherokee tribes that Father's father, grandmother and grandfather were potential Indian ancestors. We find no error.

### *Continuing Beneficial Relationship Exception.*

Section 366.26 provides in relevant part: "If the court determines . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption . . . [¶] [unless] [t]he court finds a compelling reason for determining that termination would be detrimental to

the child due to one or more of the following circumstances:  [¶]  . . . The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)

Father contends this exception to adoption as the statutorily preferred permanent plan applies here because he maintained regular, positive, affectionate visitation with the minor and as a result they share such a strong bond that J.C. would benefit from continuing their relationship, despite the fact she did not have a primary attachment to him.

Our review of the juvenile court's order, whether for substantial evidence (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576) or for abuse of discretion (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351), or a combination of both (*In re K.P.* (2012) 203 Cal.App.4th 614, 621–622), is unquestionably deferential.  Here, the fundamental facts are not in dispute.  The minor is likely to be adopted.  The minor has never been in Father's custody.  She was placed in the preadoptive foster family's home when she was two days old, and she has remained there ever since.  The minor is under three years old. Father has consistently visited the minor throughout the dependency, for one hour once a week before reunification services were terminated, and for one hour twice a month afterwards, but because of his volatile temper and anger management issues, he has never had unsupervised visitation.  The minor generally enjoys her father's visits.  The minor's adoptive parents have taken care of her daily needs virtually for her entire life.

The beneficial parent/child relationship exception means "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed,

17

the preference for adoption is overcome and the natural parent's rights are not terminated. [¶] Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

As Father acknowledges, "[t]he [§ 366.26, subd. (c)(1)(B)(i)] exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H., supra,* 27 Cal.App.4th at pp. 575–576.)

*In re S.B.* (2008) 164 Cal.App.4th 289, on which father relies, is distinguishable. There, the minor's father was her primary caregiver for the first three years of her life. (*Id*. at pp. 293, 298.) He had complied with every aspect of his case plan but was unable to reunify with S.B. and assume full time care for her because of poor physical health and combat-related posttraumatic stress disorder. He visited with S.B. three times a week. (*Id.* at p. 294.) Her primary caretakers during the dependency were her maternal grandparents. (*Id.* at p. 293–294.) The minor expressed the wish to live with her parents *and* grandmother. (*Id*. at p. 295.) The doctor who conducted a bonding study concluded the bond between S.B. and her father was strong enough that there was a potential for harm to S.B. from severing the relationship with him. (*Id.* at p. 296.) The trial court recognized S.B. had " 'an emotionally significant relationship' " with her father (*id*. at p. 298), and based its decision to terminate parental rights in part on its understanding the

grandparents were willing to continue to allow the father to visit, an unenforceable promise. (*Id.* at p. 300.) In reversing the trial court's order terminating parental rights, the Court of Appeal observed: "The record here fully supports the conclusion [the father] continued the significant parent-child relationship *despite* the lack of day-to-day contact with S.B. after she was removed from his care." (*In re S.B.,* at p. 299.)

Here, by contrast, the minor, then 17 months old, had never spent a single day in Father's custody, but had spent all but the first two days of her young life with her prospective adoptive parents. Although Father visited the minor regularly, for one hour once a week during reunification, and twice a month after services were terminated, he had never had an unsupervised visit with her, due to his unresolved anger management issues, which precluded reunification. Although the visits were positive in that the minor evidently enjoyed them, the social worker opined the bond between father and daughter was ultimately no stronger than one of recognition. Whether we apply a substantial evidence or abuse of discretion standard of review, the result here is the same. Viewing the evidence and inferences therefrom in the light most favorable to the prevailing party, and resolving all conflicts in support of the order (*Autumn H., supra*, 27 Cal.App.4th at p. 576), we find substantial evidence supports the court's finding that Father's regular visits provided an incidental benefit to the minor, but severing the relationship would not deprive the minor of such a substantial, positive emotional attachment that the minor would be greatly harmed. (*Id.* at p. 575.) On these facts, the court's decision was not unreasonable. No abuse of discretion appears. (*In re Jasmine D., supra*, 78 Cal.App.4th at p. 1351.)

## DISPOSITION

The juvenile court's orders are affirmed.

_____

DONDERO, J.

We concur:

_____

HUMES, P.J.

_____

MARGULIES, J.